Filed 9/30/20  In re J.N. CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re J.N., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>            v.<br><br> J.N.,<br><br>    Defendant and Appellant. | A157518<br><br>(Solano County<br>Super. Ct. No. J44330) |

J.N. admitted allegations in a juvenile wardship petition that he took smartphones, computers, and other personal property from a group of seven victims by threatening them with a semiautomatic handgun.  That admission provided the basis for true findings on four counts of second degree robbery in violation of Penal Code section 211, together with special allegations of personal use of a weapon accompanying each count.  (Pen. Code, § 12022.53, subd. (b).)  The juvenile court committed J.N. to the Division of Juvenile Justice (DJJ) for a maximum term of confinement of eight years four months.  On appeal, J.N. contends the court abused its discretion by committing him to the DJJ without sufficient evidence that the commitment would result in a

1

probable benefit to him or that less restrictive alternatives were inappropriate. We affirm.

## I. BACKGROUND

A. *The Offenses*

J.N., a young man of seventeen years old at the time of the offenses involved here, accompanied by S.N., accosted a group of seven students in the parking lot of a high school. J.N. was armed with a semiautomatic pistol. He ordered all the victims to the ground, demanded that they surrender various electronic devices and other personal property, and warned them that if they did not comply quickly enough they would die. After gathering up the loot from the robbery, J.N. and S.N began to leave, at which point one of the victims gave chase and was able to pry J.N.'s weapon from him. An altercation ensued during which one of the victims was severely cut with a knife, and J.N. suffered repeated blows to the head. S.N. and J.N. ultimately managed to escape the melee, got in a car parked nearby, and with S.N. at the wheel, started to drive away.

As the pair tried to flee, J.N. and S.N. were detained and ultimately arrested by responding officers. In the car, the officers found backpacks and multiple cell phones and computers belonging to the victims. The officers did not find a firearm on J.N. or S.N, or in the car, but later found a loaded, semiautomatic pistol with blood on it and its serial number scratched off, lying in the grass near the high school. S.N. told officers that he saw J.N. lying on the ground not moving while several boys stood around him and one stomped on his head. J.N. was taken to the hospital for head injuries. He was unresponsive at times.

Upon being discharged from the hospital, J.N. was read his *Miranda* rights and agreed to speak to an officer. He told the officer he did not

2

remember very much, and he denied having a gun during the incident with S.N. in the high school parking lot.  He said the group of boys they fought with claimed to be Sureños and attacked him when he attempted to run.  Later, when interviewed in the detention facility, J.N. said he did not want to talk about the incident because he was trying to forget it.  He also said that he made a "big mistake" and wished that he could "take it all back."  He said he felt bad for what he did, and that he had been praying every day.  He was having problems remembering things due to being kicked in the head.

B. *The Probation Reports*

The probation department's Welfare and Institutions Code section 707 fitness report submitted in connection with an unsuccessful motion by the People to transfer the case to adult court noted that J.N. was involved in burglarizing vehicles in 2016 for which he completed a six-month felony diversion program.  He was referred to the county juvenile accountability program for resisting arrest in April 2018.  Then, in August 2018, J.N. was involved in an armed robbery at a Motel 6.  He was the front passenger in a car driven by his brother, which was found with stolen bags and a gun reportedly used in the robbery.  The case was still pending at the time of the robbery in this case.

According to the fitness report, J.N. was in 11th grade, but not enrolled in school.  When enrolled, he was chronically truant, had a history of bad behavior, and had received no credits since starting high school.  He had regularly used marijuana since age 13.  The report indicated that J.N. has five older brothers and that, when he was four, his parents divorced and he lived with his mother and two of his brothers.  When J.N., his brother and mother were evicted in 2015, he lived with his father, but occasionally stayed with his mother and her boyfriend.

3

In connection with the disposition hearing, after J.N admitted the four second degree robbery counts in a 17-count petition, the assigned probation officer submitted a disposition report recommending that J.N. be committed to DJJ.  The probation officer considered the nature of J.N.'s offenses and their impact on the victims; J.N.'s attitude towards the offenses; his parents' attitude toward his continuing entanglement with the juvenile justice system; his background, and the available dispositional facilities.  The probation officer concluded that J.N. was "at high risk to reoffend" and that among several areas of concern was J.N.'s drug use.

In the disposition report, the probation officer took particular note of the "the totality of the offenses and the minor's actions" during the offenses. She noted that J.N. approached the victims, "retrieved a firearm from his waistband, 'chambered a round' in front of the students, and pointed the firearm at them.  His actions in 'chambering a round' of ammunition in front of the students, was intimidating and instilled fear in them, displaying a high level of sophistication.  With the gun aimed at [the victims], he ordered them on their knees in a deliberate attempt to control [them] and their movements."

In arriving at a disposition recommendation, the probation officer also took note of and placed emphasis on the negative effects of J.N.'s actions on the victims:  "One family declined to make a statement, but for the other six families, all shared their lives have been negatively affected by the crime. The victims do not feel safe in their home[s] and have had to increase safety measures at their homes.  They do not feel safe at school and their school work and attendance ha[ve] declined considerably.  Many of them are in therapy, have flashbacks and nightmares of the crime and are afraid someone is going to assault them again.  Several of the victims thought they

4

were going to die that day when they had a gun pointed at their head[s]; three of them were pistol whipped by the codefendant.  Several of the victims ran back to school and were dripping blood, had bloody shirts[,] and [one victim] had the tip of his thumb cut off.  [¶] They are still afraid some of the suspects['] friends may retaliate against them."

The probation officer noted that J.N. "admitted he has been smoking 'a blunt or two' every day this year (2018)" and "was selling Xanax at school." And J.N.'s drug use was on top of a "considerable disciplinary record, which details a pattern of noncompliance, theft, disregard for authority, physical aggression and numerous threats of violence."  The probation officer detailed J.N.'s poor school attendance and poor performance when he did attend, a record that featured "37 all day truancies during the 2018 Spring semester" and failure to "receive[] any credits" toward graduation.  Furthermore, it was reported, J.N. "accumulated a total of 27 discipline referrals from 10/2/08 to 5/24/17 for fighting, threats, disruptions, profanity, stealing, and disrespectful behavior."

Delving into J.N.'s criminal history, the probation officer reported that "[a]lthough minimal services were previously offered to [J.N.] through two diversion programs . . . , his criminal activities and sophistication is clearly escalating."  The probation officer reported J.N.'s comments about the gun used in the Motel 6 robbery in which he stated that he carried the .380 pistol in his possession that day "because it made him feel 'cool.' "  Pointing to that incident and those comments, the probation officer noted that "[m]ost significant is the danger [J.N.] poses to the community, as he has been caught with two different loaded guns in less than a month."  In light of all of these concerns, the probation department's disposition recommendation was as follows:

"Due to the serious nature of [J.N.]'s conduct coupled with the significant trauma caused to multiple victims, [J.N.]'s case was brought before the Juvenile Placement Screening Committee for review on 12/11/2018. The Committee considered several central factors including the gravity of the current offense, the sophistication in terms of circumstances, the significant trauma to the victims, and the continuing pattern of firearms related behavior exhibited by [J.N.]. The Committee recommended that [J.N.] be committed to the California Department of Corrections and Rehabilitation (CDCR) Division of Juvenile Justice. The trauma he caused the victims and their families, and the severity of the crime require the highest level of services available at this time. This is the last effort at rehabilitation for Probation due to [J.N.]'s age and community safety requires removal from the community for a longer term than can be achieved through a Challenge commitment. [J.N.]'s needs can be addressed through DJJ, including education, cognitive behavioral therapy, vocational training, and it will provide for the safety of the community."

C. *The Disposition Hearing*

The court held a two-day disposition hearing at which it considered the entire file of proceedings, as well as a great deal of evidence that was presented specifically in connection with the issue of disposition, including (1) offered in support of J.N., testimony of a forensic psychologist expert, Dr. Richard Geisler; the testimony of one of J.N.'s juvenile hall teachers; the testimony of one of J.N.'s brothers; and, (2) offered in support of the People, the supplemental probation report recommending a disposition, and the testimony of the supervising probation officer, Tarita Tennison, who oversaw the preparation of the probation department's disposition report. The crux of the issue at the disposition hearing was whether J.N. should be given a local

6

placement in something called the Challenge Program, where J.N. would be eligible for supervised release into the community in less than a year, or should be committed for a longer period to DJJ, a secure and much more structured, though more distant, placement.

Dr. Geisler thought it would be beneficial for J.N. to maintain close ties with adults who "will let him know he's valued." J.N.'s teacher at juvenile hall during his months long stay from detention to disposition pointed out that he had thrived academically while there and offered high praise for the effectiveness of the Challenge Program. Pointing to J.N.'s positive adjustment at juvenile hall, J.N. argued that the dramatic academic improvement he made there "exemplifies the effectiveness of a local commitment, especially in a program such as Challenge."

Tennison, on the other hand, emphasized the seriousness of J.N.'s offenses, and opined that programmatically, DJJ was a superior option to the Challenge Program. While Tennison disagreed with J.N.'s witnesses as to the appropriateness of a local placement disposition, she adopted and relied upon Dr. Geisler's observation that J.N. needed "a secured, highly-structured therapeutic environment of sufficient length to insure [he is] no longer [a] risk to the community," which she said was consistent with the placement option she urged—DJJ.

Included in the evidence admitted at the disposition hearing was an exhibit offered by J.N. along with the probation officer's testimony, describing the rehabilitative services available at DJJ. A significant point made by Tennison had to do with the length of time it would take to monitor J.N. closely enough to ensure he was no longer a danger to public safety. According to her, the Challenge Program was unsuitable because it has only one cognitive behavior program, participants in it are eligible for supervised

7

furloughs after 100 days, and after six months are eligible for unsupervised furloughs.  At DJJ, on the other hand, given J.N.'s age, and the length of time he could be kept at DJJ, she opined that DJJ was a better fit for J.N.'s needs.  She pointed out, for example, that the DJJ offered drug rehabilitation services, while the Challenge Program did not.

When asked why DJJ was consistent with the recommendation Dr. Geisler made about the need for a "a secured, highly-structured therapeutic environment of sufficient length to insure [he is] no longer a risk to the community," Tennison testified that "I can speak more to why Challenge isn't, but DJJ would be three years . . . minimum before the eligible parole date.  They offer two levels of cognitive behavioral trauma focus treatment.  They offer cognitive behavioral substance abuse treatment, which is a need that was identified as a high need.  They offer mental health counseling, education services, re-entry services and things of that nature."

On the evidence presented, the court opted for a DJJ placement, reasoning as follows:  "The question is . . . what is available and suitable for [J.N.] at this time," which requires an assessment of "what is available [locally] that could assist [J.N.] in rehabilitating and having the best future available to him, which is what we all wish.  Nobody wants simply to punish.  That's not appropriate.  Punishment is a valid component of juvenile justice, but that's not the only factor.  [¶] And I would disagree with counsel's argument that Challenge mirrors DJJ except for length.  That's not what we heard in evidence.  There was not a substance abuse component nor does DJJ have unsupervised furloughs, which can be a concern.  I wish there was something in between.  I've said it numerous times.  There just isn't."

"So the Court has to balance all factors, and I was very impressed with Dr. Geisler.  He was a very good witness, and he had a lot of insight.  He very

8

clearly recognized that [J.N.] should he be in the best position to integrate into the community in a safe manner for him and the general society, [and] he does need a highly structured programming. It does not sound to the Court as if Challenge is set up for his individual needs. . . . [¶] . . . [¶] I do believe Probation's recommendation is well supported both in the report submitted and supplemented both by the testimony of the witnesses, including Dr. Geisler and Petitioner's Exhibit Number 1, which describes in detail the extensive programming and options available to [J.N.] . . . that Juvenile Hall through Challenge just doesn't have, and that is the longest program available at the Juvenile Hall facility. The good news is that the educational benefits [J.N.] has gleaned and his good behavior as of recent certainly will assist him in his transition to DJJ and will certainly help him reach his goals in a more expedited manner, and that's what we all wish."

## II. DISCUSSION

A. *Applicable Legal Principles*

A juvenile court has broad discretion in determining the appropriate rehabilitative and punitive measures for offenders. (Welf. & Inst. Code, § 202; *In re Asean D.* (1993) 14 Cal.App.4th 467, 473; *In re George M.* (1993) 14 Cal.App.4th 376, 379; *In re Michael D.* (1987) 188 Cal.App.3d 1392, 1395) (*Michael D.*).) An appellate court will not lightly substitute its judgment for the dispositional judgment of the juvenile court, but rather must indulge all reasonable inferences in favor of the decision and affirm the decision if it is supported by substantial evidence. (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1330; *In re Asean D., supra,* at p. 473; *Michael D., supra,* at p. 1395.)

" ' "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citation.] "Substantial evidence . . . is not synonymous with 'any' evidence." Instead, it

9

is " ' "substantial" proof of the essentials which the law requires.' " ' [Citation.] 'Substantial evidence is . . . not merely an appellate incantation designed to conjure up an affirmance. To the contrary, it is essential to the integrity of the judicial process . . . . "The Court of Appeal 'was not created . . . merely to echo the determinations of the trial court. A decision supported by a mere scintilla of evidence need not be affirmed on review.' " ' [Citation.] [¶] The juvenile court is required to 'consider "the broadest range of information" in determining how best to rehabilitate a minor and afford him adequate care.' " (*In re Carlos J.* (2018) 22 Cal.App.5th 1, 6–7 (*Carlos J.*).)

In determining whether substantial evidence supports a DJJ commitment order, the court examines the record presented at the disposition hearing in light of the purposes of the juvenile law. (Welf. & Inst. Code, § 200 et. seq.; *Michael D., supra,* 188 Cal.App.3d at p. 1395.) Since 1984, section 202 has required that courts commit delinquent minors "in conformity with the interests of public safety and protection, [to] receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances." (Welf. & Inst. Code, § 202, subds. (b), (e)(5); *In re Lorenza M.* (1989) 212 Cal.App.3d 49, 57; *Michael D., supra,* at p. 1395.)

While courts may properly consider " 'punishment for rehabilitative purposes and . . . a restrictive commitment as a means of protecting the public safety' " (*In re Carl N.* (2008) 160 Cal.App.4th 423, 433), rehabilitation remains an important objective of the juvenile law. (*In re Teofilio A.* (1989) 210 Cal.App.3d 571, 576.) The rehabilitative purposes of a DJJ commitment are satisfied when there is substantial evidence in the record (1) demonstrating probable benefit to the minor, and (2) supporting a determination that less restrictive alternatives are ineffective or

10

inappropriate.  (Welf. & Inst. Code, § 734; *Carlos J., supra,* 22 Cal.App.5th at p. 6; *In re Pedro M.* (2000) 81 Cal.App.4th 550, 555.)

An " 'appellate court reviews a commitment decision for abuse of discretion, indulging all reasonable inferences to support the juvenile court's decision.' " (*In re A.R.* (2018) 24 Cal.App.5th 1076, 1080.)  Under this standard, "[a] DJJ commitment is not an abuse of discretion where the evidence demonstrates a probable benefit to the minor from the commitment and less restrictive alternatives would be ineffective or inappropriate." (*In re M.S.* (2009) 174 Cal.App.4th 1241, 1250.)  Moreover, "[a]lthough the DJJ is normally a placement of last resort, there is no absolute rule that a DJJ commitment cannot be ordered unless less restrictive placements have been attempted." (*Ibid.*; *In re Teofilio A., supra,* 210 Cal.App.3d at p. 577.)

B. *Probable Benefit*

Substantial evidence supports the juvenile court's finding that commitment to DJJ would provide J.N. a probable benefit.  Thus, the juvenile court properly carried out its duty:  a "[juvenile] court is only required to find if it is probable a minor will benefit from being committed." (*In re Jonathan T.* (2008) 166 Cal.App.4th 474, 486.)  A juvenile court can make such a finding where it "anticipate[s] minor[s'] needs would be addressed by programs offered at DJJ." (*Ibid.*)  In this case, substantial evidence supported the court's finding that DJJ commitment was necessary to afford J.N. the time he needed to rehabilitate.  Tennison, who observed Dr. Geisler's testimony, relied upon Geisler's view that a "secured, highly structured therapeutic environment of sufficient length" was optimal.  Similarly Tennison herself recommended that J.N. should be committed to DJJ in part because DJJ services were superior to those available in the Challenge Program and because "the significant emotional and physical trauma to the

11

victims in this case warranted removal from the community for longer than nine months," which was the length of the Challenge Program.

There is authority for the appropriateness of considering confinement duration in a placement decision. (*In re M.S., supra,* 174 Cal.App.4th at p. 1248.) Additionally, substantial evidence indicates that DJJ programs would provide J.N. with an array of resources beneficial to his rehabilitation. Consideration of the DJJ's educational resources is appropriate in recommending placements for minors; other courts have taken into account whether when minors may benefit from such resources. (*In re Michael D., supra,* 188 Cal.App.3d at pp. 1394–1395; *In re Lorenza M., supra,* 212 Cal.App.3d at p. 52.) Here, the DJJ's programs could provide probable benefit to J.N. For example, the court noted that J.N. had "extensive programming and options available" to him at DJJ that the Challenge Program simply does not have. J.N. takes issue with the strength of the evidence offered to support that finding, but the bottom line is that there was evidence of reasonable, credible and solid value to support the trial court's determination—specifically, Petitioner's Exhibit 1 and Tennison's testimony. Under the substantial evidence test, we cannot substitute our judgment on this key finding.

## C. *No Less Restrictive Alternatives*

The juvenile court also appropriately concluded that no less restrictive alternative placements were available that could meet J.N.'s needs, address the danger he posed to public safety, and redress the wrongs his victims suffered. In making a placement determination, a juvenile court need not follow any particular order in its placement of a juvenile, i.e., from least to most restrictive, and a juvenile court does not necessarily abuse its discretion by committing a minor to DJJ before other options have been exhausted.

12

(*John L. v. Superior Court* (2004) 33 Cal.4th 158, 184–185, fn. 10, citing *In re Eddie M.* (2003) 31 Cal.4th 480, 507, fn. 16.)  So long as a court concludes that alternative placements would be ineffective, a court need not try other placements prior to DJJ commitment.  (*In re M.S., supra,* 174 Cal.App.4th at p. 1250.)

To begin with, the significant risk to public safety posed by J.N. and the prospect of a relatively early release into the community through the Challenge Program, by itself, is enough to justify the juvenile court's choice of DJJ as a more secure and longer-term commitment.  Indeed, the Challenge Program may have been an alternative, but the fact that it was less restrictive also meant it was less suitable because it was less secure and J.N. would likely end up being released into the community far earlier than with a DJJ commitment.  And upon striking the relevant balance—and weighing public safety, as it was required to do—the court reasonably concluded, based on substantial evidence, that DJJ was the more appropriate choice.

In her testimony, as noted above, Tennison opined that the array of DJJ rehabilitative services was superior to those available in the Challenge Program, as the Challenge Program "only offers one cognitive behavioral treatment program" and "allows youth to leave the facility after only a hundred days for supervised volunteer work and community service, community events," as well as "unsupervised furloughs where they return home to the community after six months and having completed only half of the cognitive behavioral group that's offered."  This reflects the probation officer's concern about J.N.'s "considerable disciplinary record, which details a pattern of noncompliance, theft, disregard for authority, physical aggression and numerous threats of violence."

13

Furthermore, as Tennison pointed out in her testimony, the Challenge Program does not "provide substance abuse counseling, which was determined to be a high need area for this minor." J.N. "admitted he has been smoking 'a blunt or two' every day this year (2018)" and "was selling Xanax at school." Given the fact that J.N.'s rehabilitation must include, specifically, drug rehabilitation, Tennison opined that compared to DJJ the Challenge Program could not adequately address J.N.'s rehabilitation needs. The juvenile court was within its discretion in accepting that opinion.

We therefore conclude that the juvenile court's chosen disposition must be upheld. No abuse of discretion occurs where the record demonstrates "both a probable benefit to the minor . . . and the inappropriateness or ineffectiveness of less restrictive alternatives." (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396.) The maximum term of confinement J.N. now faces as he enters adulthood is undoubtedly considerable, and the strain on family unification will be significant. But protection of the public and holding wayward juveniles to account for their delinquency are legitimate goals of juvenile law, along with rehabilitation. (Welf. & Inst. Code, § 202; *In re Gregory S.* (1978) 85 Cal.App.3d 206, 213; *In re Asean D., supra,* 14 Cal.App.4th at p. 473.) While we applaud the progress J.N. made while awaiting the disposition hearing in this case and hope it continues, we cannot second-guess the trial court's decision to give priority to public safety, given the seriousness of J.N.'s offenses and past record.

D. *In re Carlos J.*

J.N.'s argument to the contrary rests on *Carlos J., supra,* 22 Cal.App.5th 1, where the minor admitted to assault with a firearm, which he committed with an older coparticipant, and accepted a gang enhancement. (*Id.* at p. 4.) The minor's record with the juvenile court system was

insubstantial and consisted of his being found in the company of gang members and running from police after attempting to break into a residence. *(Id.* at p. 7 & fn. 4.) The probation department recommended DJJ based on the gravity of the offense and reaffirmed the recommendation in a supplemental report after the minor's psychologist discouraged DJJ commitment. (*Id.* at pp. 7–9.)

In both the initial and supplemental reports, the probation department indicated "gang intervention services" were warranted, given the minor's behavior, but did not cite specific programs at DJJ that could provide such services. (*Carlos J., supra,* 22 Cal.App.5th at pp. 7–9.) The juvenile court committed the minor to DJJ based on the "seriousness of the offense" and the court's observation that "recent changes" at DJJ, such as a decrease in its number of participants, allowed it to "provide additional services to the youth now incarcerated." (*Id.* at p. 9.) Division Five of this court reversed, finding no substantial evidence of probable benefit and remarking, "there must be *some* specific evidence in the record of the programs at the [DJJ] expected to benefit a minor." (*Id.* at p. 10, italics in original.) Without such evidence, the appellate court held, it could not "review the adequacy of the evidence supporting the finding" of probable benefit. (*Ibid.*)

The People sharply criticize *Carlos J.* for what they contend is a requirement of " 'specific evidence' " that goes "well beyond the requirements other courts have imposed." Citing *In re A.R., supra,* 24 Cal.App.5th at page 1081, footnote 3, they argue that "[a]t least one court has . . . declined to follow" the holding in *Carlos J.* and they implicitly invite us to do so here as well. To the extent the People mean to suggest that anything in *A.R.* disagrees with the holding in *Carlos J.,* that is not how we read the opinion in *A.R.* The *A.R.* court distinguished *Carlos J.* because there was an adequate

15

record on which to conduct review of the placement at issue there. (*In re A.R., supra,* at pp. 1081–1082.) *Carlos J.*, in our view, stands as an important reminder to juvenile courts and the bar about the importance of making a sufficiently clear dispositional record so that, on appeal, we may carry our appellate responsibilities properly.[1] We see nothing in *A.R.* or any other published case that casts doubt on the holding or reasoning of *Carlos J.*

We conclude that *Carlos J.* is distinguishable, just as the *A.R.* panel did. The juvenile court in *Carlos J.* took no testimony and selected a disposition solely based on a review of the paper reports, and arguments of counsel, much of which supplied nothing but speculation about the nature of the programming available at DJJ. (*Carlos J., supra,* 22 Cal.App.5th at p. 9.) By contrast, here, there is a robust record from a multiday disposition hearing at which the court took extensive testimony, including the testimony of an expert who addressed J.N.'s specific needs. There was also documentary and testimonial evidence about the programmatic "fit" of a DJJ placement to those needs, relative to the Challenge Program. Because there is an adequate record for us to review, and because, based on that record, it is

---

[1] "[T]he law unambiguously requires the probable benefit finding to be made on the basis of *actual evidence in the record.* We recognize that the participants in the below proceedings—the juvenile court, the probation department, and counsel for appellant and respondent—frequently participate in placement determinations and have some knowledge of the programs at the [DJJ] and other placements. It may be reasonable in such circumstances for participants in the proceedings to speak in 'shorthand' about placements and other matters. Nevertheless, judicial review *by this court*, requires some concrete evidence in the record about relevant programs at the [DJJ]. Otherwise, this court's review for substantial evidence is an empty exercise, not meaningful appellate review of a legal proceeding resulting in commitment of a minor to the [DJJ]." (*Carlos J., supra,* 22 Cal.App.5th at pp. 11–12 (italics in original).)

clear the juvenile court exercised is discretion in a reasonable way after considering the appropriate criteria, we see no abuse of discretion.

## III. DISPOSITION

Affirmed.

STREETER, Acting P. J.

WE CONCUR:

TUCHER, J.
BROWN, J.